UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CATHERINE CORCORAN, an individual | **Case No. 2:25-cv-10284** |
| Plaintiffs, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS [DKT. NO. 15]** |
| v. | |
| DARK AGE CINEMA, LLC, a New York limited liability company; ART THE CLOWN, LLC, a New Jersey limited liability company; FUZZ ON THE LENS PRODUCTIONS, LLC, a New York limited liability company; PHIL FALCONE, an individual; DAMIEN LEONE, an individual, | |
| Defendants. | |

Before the Court is Defendants' Dark Age Cinema LLC, Art the Clown LLC, Fuzz on the Lens Productions, LLC, Phil Falcone, and Damien Leone (collectively, "Defendants") Motion to Dismiss. Mot., Dkt. No. 15. Plaintiff Catherine Corcoran filed a timely Opposition, Dkt. No. 19, and Defendants filed a Reply, Dkt. No. 21. The Court had a hearing on the matter on March 13, 2026. For the following reasons, the Motion is **GRANTED IN PART AND DENIED IN PART.**

1

## I.    BACKGROUND

This case is rooted in the familiar Hollywood narrative of vulnerable, up-and-coming actors and actresses navigating an often-unforgiving film industry. Plaintiff Catherine Corcoran, a young actress, brings this action in connection with her role in the 2016 film *Terrifier*, the underground hit that launched the *Terrifier* movie series. She alleges the following:

In 2015, Defendant Damien Leone began developing a low-budget, feature-length, slasher-horror film under the working title *Terrifier*. First Amended Compl. ("FAC") ¶ 18, Dkt. No. 15. The film was funded by Defendant Phil Falcone and jointly produced by Leone's company, Dark Age Cinema, LLC, and Falcone. *Id.* Plaintiff Catherine Corcoran was cast in the role of "Dawn," a character killed in the now-iconic scene where she was nude, upside down, shackled by her feet, and sawed in half with a hacksaw by the movie's villain, Art the Clown. *Id* ¶ 18-19.

To accommodate the film's low budget, Plaintiff agreed to work for a $100 daily rate under the Screen Actors Guild Employment of Performer for Ultra Low Budget Film agreement ("Performer Agreement"). *Id.* ¶ 20; *see also* Screen Actors Guild Employment of Performer for Ultra Low Budge Film ("Performer Agmt."), FAC, Ex. 1. On July 8, 2015, Plaintiff also signed a Mutual Non-Disclosure Agreement ("NDA"), pursuant to which she would "receive 1% of the profits of 'Terrifier'". FAC ¶ 22; *see also* Mutual Non-Disclosure Agreement ("NDA"), FAC, Ex. 2 at 1.

Filming took place during the fall and winter of 2015. FAC ¶ 24. During filming, Plaintiff endured extreme conditions, including "long hours in below freezing temperatures, all without heat and some without bathrooms," and the use of "prosthetics with actual rat feces." *Id*. Plaintiff also was forced to endure the botched creation of a silicone mold for her body cast. *Id.* To create the prosthetic, Plaintiff was required to lie nude on plywood and was covered in a quick-drying silicone agent. *Id.* The process, however, was done incorrectly and Plaintiff underwent the long and painful process of removing the dried silicone from her body. *Id.* Defendant Falcone allegedly took

2

numerous photos of her body while she was glued to the plywood without her consent or knowledge. *Id.*

During filming of her iconic murder scene, Plaintiff was topless and the only woman present during filming. *Id.* ¶ 25. Plaintiff also alleges that an unknown crew member took photos of her naked body with her knowledge or consent during this time. *Id.* The scene itself was intense, spanning ten hours. *Id.* ¶ 26. Since she was suspended and upside-down, filming needed to be done in 40-second intervals, to mitigate the pooling of blood in her head. *Id.* Filming took place in a cold building, requiring Plaintiff to be wrapped in a blanket between takes. *Id.* She subsequently felt ill and later was diagnosed with suffered cranial swelling and eardrum damage as a result of being hung upside down for an extended period of time. *Id.*

In October 2016, *Terrifier* premiered at the Telluride Horror Show Film Festival and, in July 2017, was shown at the IFC Midnight's Scary Movie Showcase at Lincoln Center. *Id.* ¶ 27. The film was released to theaters on March 15, 2018, to DVD and Blu-ray on March 27, 2018, then to Netflix on September 1, 2018. *Id.*

At this point, Plaintiff alleges she had received no royalties. *Id.* ¶ 28. However, given the limited theatrical release and underground nature of the film, she assumed that no profits were yet generated. *Id.* In August 2019, Plaintiff and Defendant Dark Age Cinema also entered into a Merchandising Agreement, through which Dark Age Cinema agreed to pay Plaintiff "as royalty a sum equal to one percent (1%) of all [Dark Age Cinema's] net sales of Merchandising" of Plaintiff's name, likeness, voice, and visual representation. *Id.* ¶ 28; *see also*, "Merch. Agmt." Mot., Ex. D.

In 2019, Defendant Leone began developing *Terrifier 2*, quickly crowd-sourcing the $250,000 budget for the film. FAC ¶ 29. *Terrifier 2* was released in 2022 with a significantly wider theatrical release than *Terrifier*. *Id.* ¶ 31. During its initial run in North America, *Terrifier 2* grossed $10,000,000 and an additional $5,000,000 globally. *Id. Terrifier 2*'s success generated renewed interest in *Terrifier*, which was re-released in theaters in 2023, grossing over $400,000. *Id.* While Plaintiff did not have a role in

3

*Terrifier 2*, she had a photographic cameo from her role as Dawn in *Terrifier* and signed a Screen Actors Guild re-use agreement. *Id.* ¶ 30.

During this time, Plaintiff began receiving sporadic payments in connection with *Terrifier*; however, the memo lines on the checks were ambiguous. *Id.* ¶ 33. She was also not provided any accounting figure reflecting how the payment was derived. *Id.* ¶ 33.

In October 2024, a third installment of the series named *Terrifier 3* was released, grossing $90.3 million in domestic and international box offices. *Id.* ¶ 34. *Terrifier* and *Terrifier 2* were also re-released in response to this success. *Id.*

Despite the success of all the films, in July 2024, Plaintiff stopped receiving film royalties with no explanation. *Id.* ¶ 35. At this point, she had only received a total of $1,816.35. She received one additional payment for "UK Payment to June 2025" in October 7, 2025, with no explanation of how this payment was calculated. *Id.* Plaintiff has also received a total of $6,408.26 in merchandise royalty payments. *Id.*

Plaintiff filed the present action pursuant to 28 U.S.C. §1332 federal diversity jurisdiction seeking compensatory damages, punitive damages, an accounting, an injunction, and costs of the suit. FAC at 21.  Plaintiff alleged eight causes of action: (1) Violation of California Civil Code § 1708.85; (2) Breach of Contract; (3) Promissory Fraud; (4) Breach of the Implied Covenant of Good Faith and Fair Dealing; (5) Money Had and Received; (6) Violation of California Business and Professional Code §§ 17200; (7) Accounting; and (8) Common Law Invasion of Privacy – Public Disclosure of Private Facts.

In response, Defendants filed this Motion to dismiss all eight counts for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure ("Rule") 8 requires a plaintiff to present a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R.

Civ. P. 8(a)(2). Under Rule 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To defeat a Rule 12(b)(6) motion to dismiss, the complaint must provide enough detail to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must also be "plausible on its face," allowing the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. Labels, conclusions, and "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

A complaint may be dismissed under Rule 12(b)(6) for the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). When ruling on a Rule 12(b)(6) motion, "a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (2009) (internal quotation marks omitted).

A court generally may not consider materials other than facts alleged in the complaint and documents that are made a part of the complaint. *Anderson v. Angelone*, 86 F.3d 932, 934 (9th Cir. 1996). However, a court may consider materials if (1) the authenticity of the materials is not disputed and (2) the plaintiff has alleged the existence of the materials in the complaint or the complaint "necessarily relies" on the materials. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (citation omitted). The court may also take judicial notice of matters of public record outside of the pleadings and consider them for purposes of the motion to dismiss. *Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988); *Lee*, 250 F.3d at 689-90.

### III.    DISCUSSION

Defendant argues Plaintiff's action should be dismissed for failure to state a claim. The Court reviews each of Plaintiff's claims under the Rule 12(b)(6) standard.

### A. Choice of Law

As an initial matter, the Parties dispute whether California or New York law governs the NDA contract-related claims of this case. "A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law." *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir. 2001). Plaintiff argues that resolving choice-of-law issues would be premature at the pleading stage. Opp'n at 18, n. 10. However, generally, Courts have declined to defer the choice-of-law issue if the factual record is sufficient to support a determination. *See Frenzel v. AliphCom*, 76 F. Supp. 3d 999, 1007-08 (N.D. Cal. 2014), *Kissel v. Code 42 Software, Inc.*, 2016 WL 7647691, at *3 (C.D. Cal. 2016); *but see Bias v. Wells Fargo &. Co*, 942 F. Supp. 2d 915, 930 (N.D. Cal. 2013) (declining to make a determination of choice of law questions at the pleadings stage as the issue was better suited for determination at the class certification stage).

The Ninth Circuit has acknowledged that there appears to be a dispute among California courts on whether the choice of law rule for contracts is the common law governmental interest test or the statutory test under California Civil Code § 1646. *Arno v. Club Med Inc.*, 22 F.3d 1464, 1468 n. 6 (9th Cir. 1994) (collecting cases).  Under the governmental interest test, courts engage in a three-step inquiry:

> First, the court must determine whether the substantive laws of California and the foreign jurisdiction differ on the issue before it. Second, if the laws do differ, then the court must determine what interest, if any, the competing jurisdictions have in the application of their respective laws. If only one jurisdiction has a legitimate interest in the application of its rule of decision, there is a 'false conflict' and the law of the interested jurisdiction is applied. But if more than one jurisdiction has a legitimate interest, the

court must move to the third stage of the analysis, which focuses on the 'comparative impairment' of the interested jurisdictions.

*Cooper v. Tokyo Elec. Power Co. Holdings*, 960 F.3d 549, 559 (9th Cir. 2020).

By contrast, under California Civil Code § 1646, a "contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it was made." Cal. Civ. Code § 1646.

Absent explicit ruling from the California Supreme Court, several intermediate appellate courts have attempted to clarify when each test applies. In *Frontier Oil Corp. v. RLI Insurance Co.*, a California appellate court held that the statutory test in § 1646 applies when a court seeks to interpret a contract while the governmental interest analysis applies to all other choice of law issues. 153 Cal. App. 4th 1436, 1459 (2007).

While this clarification has not been adopted by the California Supreme Court, several district courts have adopted this interpretation. *Stein v. Farmers Ins. Co.*, 734 F. Supp. 3d 1021, 1028 (S.D. Cal. May 17, 2024); *CSNK Working Cap. Fin. Corp. v. Next Creation Holdings*, 2018 WL 276815 at *4 n.3 (N.D. Cal. Jan. 3, 2018); *Human Res. Adv., LLC. v. Hanover Ins. Co.*, 2022 WL 1214899 at *6 (E.D. Cal. Apr. 25, 2022); *see also Arrow Electronics, Inc. v. Liberty Mutual Insurance Co.*, 775 Fed. Appx. 305, 306 (9th Cir. 2019) (mem) (applying *Frontier Oil* to a breach of contract action between an insurance company and the insureds). This Court agrees with these courts.

California "requires a court to conduct a choice of law analysis for each claim or issue." *Estrella v. Freedom Fin. Network, LLC*, 2010 WL 2231790, at *4 (N.D. Cal. June 2, 2010) (citing *Washington Mutual Bank, FA v. Superior Ct.*, 24 Cal. 4th 906 (2001)). Accordingly, the Court adopts the *Frontier Oil* framework to the contract-based claims in evaluating each of the causes of action below.

**B. Claim One - Violation of California Civil Code § 1708.85 – Distribution of Sexually Explicit Materials**

Plaintiff argues that Defendants' actions throughout production and distribution

of *Terrifier* constitute a violation of California Civil Code § 1708.85. Section 1708.85, commonly known as the California "revenge-porn" statute, creates a private cause of action against:

> "a person who *intentionally distributes* by any means a photograph, film, videotape, recording, or any other reproduction of another *without the other's consent*, if (1) the person know, or reasonably should have known that the other person had a reasonable expectation that the material would remain private; (2) the distributed material exposes an intimate body part of the other person or shows the other person engaging in an act of intercourse, oral copulation, sodomy, or other act of sexual penetration, and (3) the other person suffers general or special damages as described in Section 48a.

(emphasis added). Plaintiff points to three separate incidents to support the claim: (1) the filming and distribution of her death scene in *Terrifier*, where she was nude; (2) the distribution of photos taken by Defendant Falcone without her consent during the preparation of the full-body plaster cast; and (3) the distribution of photos taken by an unknown crew member during filming of her murder scene. FAC ¶¶ 50-53. The Court agrees with Defendants that Plaintiff has not alleged a violation of § 1708.85 for any of these incidents.

### i.    Filming of Dawn's Murder Scene in *Terrifier*

Plaintiff first argues that Defendants' distribution of the film *Terrifier*, which includes a scene where she is nude, constitutes a violation of § 1708.85. The Court does not dispute that Plaintiff underwent a physically demanding experience while filming. However, despite the many struggles she faced during filming, Plaintiff has not alleged facts to plead a violation of § 1708.85.

As an initial matter, the key issue is not whether Plaintiff subjectively believed or wished the images would remain private. Rather, the question is whether *Defendants* knew or reasonably should have known that Plaintiff expected the images to be kept

private. The Court agrees with Defendant that, upon the facts alleged, Defendants could not reasonably known Plaintiff expected the material to remain private. Plaintiff, by her own admission, was on set filming the scene in the presence of many others for the express purpose of creating a scene in the *Terrifier* movie. FAC ¶¶ 25-26. Her voluntary presence on a public film set for over ten hours invalidates her position that Defendants should have known she reasonably expected privacy.

Plaintiff first argues that Defendants should have known she had a reasonable expectation of privacy since she had not signed a written consent prior to appearing in the nude scene. Defendants were required to obtain her written consent before to filming a nude scene, per the Screen Actors Guild ("SAG") Codified Basic Agreement ("CBA"). Opp'n at 13. Defendants do not dispute that there was no signed consent; however, they argue that Plaintiff's oral consent indicates she had no expectation of privacy. As Defendants argue, Plaintiff attempts to "import the SAG CBA's written consent standard into Section 1708.85." Reply at 6.

The Court agrees with Defendants. At best, Plaintiff suggests there may have been a breach of a portion of the CBA. However, Plaintiff has not demonstrated how a potential breach translates to an expectation of privacy, particularly when she does not allege any mention of the written consent prior to filming. Plaintiff herself concedes that she agreed to film the scene after discussions with Defendants. FAC ¶ 25; Opp'n at 13. Her contemporaneous conduct undercuts her position that Defendants should have understood that she maintained a reasonable expectation of privacy in the recorded material.

Plaintiff also suggests that Defendants should have known she had a reasonable expectation of privacy over the filmed material since there was no "advance notice or approval of the nude scene prior to the release of the film." Opp'n at 13-14. Yet Plaintiff does not allege any facts indicating that Defendants should have known she expected to review the film in advance of release. She does not suggest any prior agreement for right of review nor does she suggest that any such right is commonplace in the film

industry. The lack of advance notice or approval does not bear on her reasonable expectation of privacy if there was no reason she should have had that right. She further claims that the nudity was "non-essential" and that the film could have been edited in such a way as to avoid distribution of her nude image. Opp'n at 16. However, merely because the film *could* have been edited in a particular way does not suggest that Defendants should have known she expected it to be edited that way. Especially since Plaintiff knew she would be topless in the scene, it is unreasonable to expect Defendants to have known she expected the final cut of the film to exclude nudity.

Plaintiff next argues that her consent to filming the nude scene was coerced because of the "unequal bargaining pressure, Defendants' control over the production environment, and the leveraging of her vulnerable position as the sole female performer present." Opp'n at 13. These factors, however, are insufficient to raise an argument that filming was non-consensual. Generally, "[c]onsent is not effective if it is given under duress." *Lucas v. Redig*, 2004 WL 1700517, at *8 (Cal. Ct. App. July 30 2004) (quoting Rest. 2d Torts § 892B). "Duress is constraint of another's will by which he is compelled to give consent when he is not in reality willing to do so." *Jefferson Pointe Pro. Ctr. Prop. Owners Ass'n v. Kriger*, 2020 WL 373387, * 8 (Cal. Ct. App. Jan. 23, 2020) (quoting Rest. 2d Torts § 892B, com. j). Moreover, "[p]ersuasion amounting to a form of constraint can take various forms and many of them, commonly encountered in daily life, are without legal effect and are not normally characterized as duress." Rest. 2d Torts § § 892B, com. j. The "cases to date in which duress has been found to render the consent ineffective have involved those forms of duress that are quite drastic in their nature and that clearly and immediately amount to an overpowering of the will." *Id.*

The conduct identified by Plaintiff is, at most, indicative of the Parties relative positions at the time of contracting. These pressures are ordinary course constraints encountered in any bargain. They do not amount to the "drastic" situations that constitute a defense of duress. Accordingly, Plaintiff's argument that her consent was obtained under "coercive" circumstances is not compelling.

10

Finally, even if Defendants' conduct were to fall within the scope of § 1708.85, the alleged conduct would fall within the statutory safe harbors. Under § 1708.85(c), there shall be no liability on the part of the person distributing the material if "[t]he distributed material was created under an agreement by the person appearing in the material for its public use and distribution or otherwise intended by that person for public use and distribution." (c)(1). This provision covers the very conduct at issue here, or production of materials for use in film media. It is undisputed that the material at issue, or the nude scene, was shot pursuant to an agreement to produce the *Terrifier* film. However, despite the agreement to create *Terrifier*, Plaintiff argues that distribution of the footage where she appeared topless was not covered because "there was never any agreement that Defendants could distribute images of her nude body[.]" Opp'n at 16.

Plaintiff reads § 1708.85(c)(1) too narrowly. The safe harbor is not concerned with the distribution of the material; rather, whether the distributed material itself was *created* under an agreement for public use. The scene, shot pursuant to an agreement to create the *Terrifier* film, plainly fits within this exception. Additionally, given that Plaintiff's reading is unsupported by any authority, the Court is hesitant to read the safe harbor in such a narrow fashion. Accordingly, the Court finds that Plaintiff has not sufficiently alleged that filming and distribution of *Terrifier* constitutes a violation of § 1708.85.

### ii. Distribution of nude images by Defendant Falcone and an unknown crew member

Plaintiff alleges that Defendant Falcone and an unknown crew member took photos of her nude body and "upon information and belief," shared these images with third parties. FAC ¶¶ 42-43. Plaintiff provides no further details with respect to distribution of the images. A complaint that merely restates the elements of a cause of action and is supported only by conclusory statements cannot survive a motion to dismiss. *Twombly*, 550 U.S. at 555. Distribution of the offending images is a necessary

element for a claim under § 1708.85. These allegations are insufficient to survive a motion to dismiss. *See e.g.*, *Barakezyan v. BMW of N. Am., LLC*, 2016 WL 2840803, *3 (C.D. Cal. Apr. 7, 2016).

Plaintiff argues that pleading "upon information and belief" is permissible where the relevant information is "uniquely within the possession of Defendants." Opp'n at 11. While the principle is correct, Plaintiff has not shown that its application is warranted here. A plaintiff cannot "save a complaint that 'presses an implausible claim' simply by asserting a 'lack of access to evidence.'" *Wiggins v. Cnty. of Riverside*, 2025 WL 2631529, at *6 (C.D. Cal. Aug. 7, 2025) (quoting *OSU Student All. v. Ray*, 699 F.3d 1053, 1078 (9th Cir. 2012). "Even when a plaintiff lacks access to certain evidence, they must still allege facts that, when viewed in their 'entire factual context,' 'nudge [the] claim ... across the line from conceivable to plausible.'" *Id.* (quoting *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017)). Plaintiff has provided no such supporting facts. Plaintiff asks the Court to infer distribution from only allegations of possession, with no other support. This is too little to "nudge" a claim from conceivable into plausible, in alignment with the pleading standards of *Twombly*.

Accordingly, the Court finds that Plaintiff has failed to meet her burden under Rule 12(b)(6) for Claim One. The Court **GRANTS** Defendants Motion with respect to Claim One.

### C. Claim Two - Breach of Contract

Plaintiff's second cause of action alleges Defendants Dark Age Cinema, Art the Clown, Fuzz on the Lens, Falcone, Leone, and Does 1-10 breached their contractual obligations under the Mutual Non-Disclosure Agreement ("NDA"). The NDA was signed between Dark Age Cinema LLC and Plaintiff Catherine Corcoran on July 08, 2015. Under the agreement, Plaintiff would "receive 1% of the profits from *Terrifier*." FAC Ex. 2 at 1. Plaintiff claims that the Parties understood this agreement to cover "all profits generated from the exploitation of *Terrifier* related intellectual property, including without limitation and among other things all box office, streaming, DVD,

Blu-ray and VHS proceeds from all motion pictures in the *Terrifier* series, including the original and all sequels, all *Terrifier* related books, video games, live events, and other manner of licensing of the *Terrifier* intellectual property, as well as 1% of all net sales of *Terrifier* related merchandise." FAC ¶ 50. In short, she understood the NDA to cover *Terrifier*, its sequels, and any related merchandise. She claims that Defendants breached the NDA by failing to pay her the money she was due. FAC ¶ 52.

### i.    Choice of Law

As discussed above, because the issues in this cause of action concern interpretation of a contract, the Court applies California Civil Code § 1646 to determine the governing law. *Frontier Oil Corp. v. RLI Ins. Co.,* 153 Cal. App. 4th 1436, 1459 (2007). Under California Civil Code § 1646, a "contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it was made." Cal. Civ. Code § 1646. "A contract indicates a place of performance within the meaning of section 1646 if the contract expressly specifies a place of performance or if the intended place of performance can be gleaned from the nature of the contract and its surrounding circumstances." *Arrow Electronics, Inc. v. Liberty Mutual Insurance Co.*, 775 Fed. Appx. 305 (9th Cir. 2019) (citing *Frontier Oil Corp.,* 153 Cal. App. 4th at 1443).

Here, the NDA does not specify a place of performance. Where there is no place of performance indicated, the contract is governed by the law of the place where it was made. The Parties do not dispute that the contract was signed and negotiated in New York. Thus, the Court finds that New York law governs the issue of contract interpretation.

The Court also notes that, while an express conflict between the laws of the two jurisdictions is not part of the § 1646 analysis, there is no meaningful difference between the law of California and the law of New York with respect to the sufficiency of Claim Two.

### ii.    Breach of Contract

Under New York law, to plead a breach of contract, a plaintiff must allege "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Kaplan Grp. Investments LLC v. A.S.A.P. Logistics Ltd.*, 694 F. Supp. 3d 374, 387 (S.D.N.Y. 2023); *see also Satvati v. Allstate Northbrook Indemnity Co.*, 634 F. Supp. 3d 792, 797 (C.D. Cal. 2022) (finding a plaintiff must show "(1) a contract existed, (2) the plaintiff performed or is excused for nonperformance, (3) defendant breached, and (4) plaintiff was damaged").

Plaintiff has alleged all elements to a breach of contract claim. She claims a valid contract exists, that she performed, Defendants breached by failing to provide the monies owed, and that she has been damaged as a result. Defendants do not disagree that there was a valid contract or that Plaintiff performed her portion of the contract; however, they argue that there was no breach of contract. The Parties' dispute centers on whether the contract's provisions include *Terrifier*'s sequels and related material within its scope. Defendants argue that Plaintiff reads the contract too broadly. They argue Claim Two should be dismissed since the word "*Terrifier*," as used in the NDA, does not include the *Terrifier* sequels, related intellectual property, or derivative works. Mot. at 18-19. In response, Plaintiff argues that the broader interpretation of "*Terrifier*" is consistent with industry interpretations and bolstered by other allegations that Defendants understood the meaning of the word to be more expansive. Opp'n at 18-19. Plaintiff additionally observes that she began receiving payments well after the two-year term stated within the contract, indicating a course of conduct that supports her contentions. *Id.*

Issues of interpretation for reasonably ambiguous contract terms present factual questions inappropriate for resolution on a motion to dismiss. *See e.g., MSC Mediterranean Shipping Co. S.A. v. BNSF Railway Co.*, 779 F. Supp. 3d 1083, 1095 n. 12 (C.D. Cal. 2025) ("At the pleading stage, if an 'agreement is ambiguous, then interpretation of the agreement presents a fact issue that cannot be resolved on a motion

14

to dismiss.'" (quoting *ASARCO, LLC v. Union Pac. R. Co.*, 765 F.3d 999, 1008–09 (9th Cir. 2014)); *Citibank, N.A. v. Morgan Stanley & Co. Intern. PLC*, 724 F. Supp. 2d 398, 404 (S.D.N.Y. 2010) ("[W]hen a contract is ambiguous, its interpretation becomes a question of fact not appropriately resolved on a motion for judgment on the pleadings or for dismissal."). At this juncture, Plaintiff has sufficiently alleged facts to support a claim for breach of contract and there is sufficient ambiguity around the contract terms to deny Defendants' requested relief. The Court **DENIES** Defendants' Motion with respect to Claim Two.

### D. Claim Three - Promissory Fraud

Plaintiff claims that Defendants Falcone, Leone, Dark Age Cinema, and Does 1-10 engaged in promissory fraud by fraudulently representing to her that "they intended to comply with the terms of their agreement to pay her 1% of all profits derived from any future exploitation of *Terrifier* related intellectual property, including without limitation all motion pictures and merchandise" in order to have her act in *Terrifier.* FAC ¶ 55. She claims Defendants never intended to honor their agreement to pay her and that these misrepresentations were given to induce her to act in the film. FAC ¶ 56.

As this claim does not relate to interpretation of a contract, the Court applies the governmental interest test to determine which state law governs this claim. Applying the test, the Court concludes that the law of New York and California do not differ with respect to the promissory fraud issue before the Court.

In both California and New York "[a party] may not transform its contract claim into one of promissory fraud by simply pleading, without more, that [the opposing party] never intended to perform on the contracts; something more than nonperformance is required to establish a claim of promissory fraud." *Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 2012 WL 5447959, at *9 (C.D. Cal. Oct. 4, 2012). "Otherwise, every breach of contract claim would support a claim of fraud so long as the claimant adds to [the] complaint a general allegation that the defendant never intended to keep [its] promise." *Id.* at *8 (internal quotation marks and alteration

omitted); *see also Russell Pub. Grp. Ltd. v. Brown Painting Co.*, 2014 WL 1329144, at *3 (S.D.N.Y. Apr. 3, 2014) ("It is black letter law in New York that a claim for common law fraud will not lie if the claim is duplicative of a claim for breach of contract.").

Plaintiff's third claim does precisely this. Plaintiff's claim repackages breach of contract claim as a fraud claim and does not demonstrate any additional duty Defendants owed outside of the duties within the contract. Accordingly, the Court **GRANTS** Defendants' Motion with respect to Claim Three.

### E. Claim Four – Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiff claims that Defendants breached the implied covenant of good faith and fair dealing by "engaging in bad faith conduct intended to frustrate [her] rights to receive the benefits of the agreements." FAC ¶ 62. She alleges Defendants "provid[ed] cryptic and inscrutable descriptions on the 'memo' portion of Corcoran's royalty payments, fail[ed] to provide any accounting statement describing how the payment was calculated, refus[ed] to provide information when requested by Corcoran, fail[ed] and refus[ed] to act diligently in collecting monies that are otherwise owed to Corcoran, provid[ed] sporadic and irregular payments, and, on information and belief, engag[ed] in improper accounting for the sole and wrongful purpose of avoiding and/or reducing the royalty payment owed to Corcoran." *Id.*

As with the promissory fraud claim, there is no conflict between New York and California law with respect to the issue before the Court, so the Court declines to make a conflict of laws determination at this juncture.

Every contract contains an implied-in-law covenant of good faith and fair dealing. *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 683-84 (1988). "Simply stated, the burden imposed is that neither party will do anything which will injure the right of the other to receive the benefits of the agreement ... the implied covenant imposes upon each party the obligation to do everything that the contract presupposes they will do to accomplish its purpose." *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.,* 222 Cal. App. 3d

16

1371, 1393 (1990); *see also JP Morgan Chase Bank NA v. IDW Group, LLC*, 2009 WL 321222, at * 4 (S.D.N.Y. Feb. 9, 2009). Courts will generally dismiss implied covenant claims that are "simply duplicative of a breach of contract cause of action." *Landucci v. State Farm Insurance Co.*, 65 F. Supp. 3d 694, 716 (N.D. Cal. 2014) (quoting *Careau*, 222 Cal. App. 3d at 1392). However, a claim for implied covenant will not be dismissed when the "covenant claim is based on a different breach than the contract claim." *Id.* (citing *Daly v. United Healthcare Ins. Co.*, 2010 WL 4510911, at *4 (N.D. Cal. Nov. 1, 2010)); *JP Morgan Chase Bank NA*, 2009 WL 321222, at * 5 (S.D.N.Y. Feb. 9, 2009) ("[T]o simultaneously plead breach of contract and implied covenant claims under New York law, a plaintiff must allege an implied duty that is consistent with the express contractual terms, but base its implied covenant theory on allegations that are distinct from the factual predicate for its contract claims.").

Defendants argue Plaintiff's implied covenant claim fails because she has not pled any obligations separate from her breach of contract claim. However, Plaintiff has noted actions by Defendants that are separate and distinct from the contractual obligations. The Court agrees her allegations that Defendants "refus[ed] to act diligently in collecting monies that are otherwise owed to Corcoran, provid[ed] sporadic and irregular payments, and, on information and belief, engag[ed] in improper accounting for the sole and wrongful purpose of avoiding and/or reducing the royalty payment owed to Corcoran" are duplicative of the breach of contract claim. However, her other allegations that Defendants "provid[ed] cryptic and inscrutable descriptions on the 'memo' portion of Corcoran's royalty payments, fail[ed] to provide any accounting statement describing how the payment was calculated, [and] refus[ed] to provide information when requested by Corcoran" are sufficient to plead an implied covenant claim.

Accordingly, the Court **DENIES** Defendants' Motion with respect to Claim Four.

### F. Claim Five – Money Had and Received

17

As with the earlier claims, there is no conflict between New York and California law with respect to the issue before the Court, so the Court declines to make a conflict of laws determination at this juncture.

To plead a claim for money had and received, a party must plead: "(1) the statement of indebtedness in a certain sum, (2) the consideration, i.e., goods sold, work done, etc., and (3) nonpayment." *Farmers Ins. Exch. v. Zerin*, 53 Cal.App. 4th 445, 459 (1997). "[W]here a valid contract exists between the parties regarding the issue at dispute, a quasi-contractual theory, such as money had and received, cannot be maintained." *Amable v. New Sch.*, 551 F. Supp. 3d 299, 319–20 (S.D.N.Y. 2021); see *also Coldwell Banker Real Est. LLC v. New All. Props.*, 2017 WL 5635023, at *4 (C.D. Cal. June 15, 2017) (citing *Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996)).

Plaintiff argues that the claim should not be dismissed since the Parties dispute the existence of a valid contract and that she should be permitted to plead quasi-contract theories in the alternative. *Id*. Plaintiff, however, mischaracterizes Defendants' argument. There is no disagreement that a valid contract exists; rather, the disagreement is one of contract interpretation. Thus, Plaintiff's claim under a quasi-contractual theory such as Money Had and Received fails. The Court **GRANTS** Defendants' Motion with respect to Claim Five.

## G. Claim Six – Violations of California Business and Professional Code §§ 17200

Plaintiff's sixth cause of action argues that Defendants breached the California Unfair Competition Law ("UCL"), or California Business and Professional Code §§ 17200 by (1) "failing to obtain the required informed written consent to film any nude scenes . . . and then intentionally disseminating and monetizing the wrongfully and improperly obtained images for their own gain" and (2) "fail[ing] to pay Corcoran the amounts that she was and is owed pursuant to her contractual agreements concerning the *Terrifier* series[.]" FAC ¶ 68.

"The purpose of the UCL is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247 (Ct. App. 2010). "The California Supreme Court held that the UCL establishes three varieties of unfair competition-acts or practices which are [1] unlawful, or [2] unfair, or [3] fraudulent." *Id.* "Since the UCL is written in the disjunctive, a business act or practice may be alleged to be all or any of the three varieties." *Junod v. Dream House Mort. Co.*, 2012 WL 94355, at *5 (C.D. Cal. Jan. 5, 2012). Plaintiff argues that Defendants' actions are "unlawful, unfair, and fraudulent" in violation of the UCL. However, claims under the UCL are not "an all-purpose substitute for a tort or contract action." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1150 (2003). Under each prong, Plaintiff has failed to plead a cause of action.

As an initial matter, the Court observes that the second ground fails to state a UCL claim because it merely repackages her breach of contract claim. Generally, a party must plead something more than a "'garden-variety' breach of contract claim in order to allege a viable UCL claim." *Catena v. Capitol Records, LLC*, 2012 WL 12942740, at * 7 (C.D. Cal. July 11, 2012) (citations omitted). Here, Plaintiff has only realleged her breach of contract claim, or that the Defendants failed to pay her what was due under the contract. Thus, this ground cannot sustain a UCL claim.

The Court now turns to her first ground and analyzes it under the three prongs of the UCL. To plead a claim under the "unlawful" prong, Plaintiff must allege that the act violates another law. *Brasserie de Tahiti v. Oceandless Design, Inc.*, 2022 WL 18142554, *6 (C.D. Cal. Nov. 28, 2022). The first ground cannot be sustained under this prong as she has failed to allege any "unlawful" conduct. At no point does Plaintiff argue that this specific conduct is "unlawful" and, in her Opposition, makes no argument to suggest that ground one is based on "unlawful" conduct. As the Court noted above, it is unclear how the failure to obtain written consent was "unlawful" as Plaintiff's contemporaneous actions indicated consent to filming. At most, the

19

"unlawfulness" of this act stems from a breach of contract which, as the Court has noted, cannot sustain a UCL claim.

The Court next turns to the "unfair" prong. Unfair conduct "occurs when [a] practice 'offends an established public policy or when the practice is immoral, oppressive, unscrupulous, or substantially injurious to consumers." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012). Plaintiff's first ground, again, fails. As the Court has discussed earlier, despite the failure to obtain written consent, Plaintiff had consented to the filming of the *Terrifier* nude scene. Plaintiff has not sufficiently argued how, despite her consent to filming, the conduct would be considered "unfair." Accordingly, a claim under this prong also fails.

Finally, the Court reviews the "fraudulent" prong. To show fraudulence, a plaintiff must show that "a misrepresentation was directly related to injurious conduct and that the claimant actually relied on the alleged misrepresentation." *Brasserie de Tahiti*, 2022 WL 18142554, *7. While claims under this prong need not satisfy the elements of the common law tort of fraud, claims are nevertheless subject to the heightened pleading standards of Rule 9(b). *Id.* Plaintiff has not alleged any fraud with respect to ground one. Like the "unfair" prong, there is no suggestion that Defendants made any misrepresentations to Plaintiff or that they engaged in any kind of fraud. Thus, this prong fails.

As there is no basis for a UCL claim, the Court **GRANTS** Defendants' Motion with respect to Claim Six.

**H. Claim Seven – Accounting**

As this claim is not one involving interpretation of a contract's provisions, the Court applies the governmental interest test to determine whether California or New York law applies to this cause of action.

First, the Court considers whether a material conflict exists between California and New York law regarding the sufficiency of Plaintiff's accounting claim. There is no dispute between the Parties that the applicable law differs. In California, an equitable

action for an accounting has two elements: "(1) that a relationship exists between the plaintiff and defendant that requires an accounting" and (2) "that some balance is due the plaintiff that can only be ascertained by an accounting." *Sass v. Cohen*, 10 Cal. 5th 861, 869 (2020). The second element requires that the accounts be "so complicated that an ordinary legal action demanding a fixed sum is impracticable." *Jolley v. Chase Home Fin., LLC*, 213 Cal. App. 4th 872, 910 (2013). In other words, "the accounts between the parties [must be] of such a complicated nature that only a court of equity can satisfactorily unravel them." *Hueso v. Select Portfolio Servicing, Inc.*, 527 F.Supp.3d 1210, 1235 (S.D. Cal. 2021) *overruled on other grounds, Grouse River Outfitters, Ltd. v. Oracle Corp.*, 848 Fed. Appx. 238 (9th Cir. 2021) (overturning *Hueso* holding related to section 496(c) claims).

By contrast, under New York law, an action for an equitable accounting requires "(1) a relationship of a fiduciary or confidential nature; (2) money or property entrusted to the defendant imposing upon him the burden of accounting; (3) the absence of an adequate legal remedy; and (4), in some cases, a demand for an accounting and a refusal." *Grgurev v. Licul*, 229 F. Supp. 3d 267, 290 (S.D.N.Y. 2017) (quoting *Matsumura v. Benihana Nat'l Corp.*, 2007 WL 1389758, at *4 (S.D.N.Y. May 21, 2007)). "In some cases, the New York courts have held that a fiduciary or confidential relationship is not necessary to obtain judicial relief—but they have done this only by treating the action for accounting as an action at law for monetary relief, and not as an equitable action for accounting." *Id.* at 291.

The Court declines to determine the conflict of laws issue at this juncture because Plaintiff's claim is insufficient under either jurisdiction's laws. Because it is insufficient under both theories, there is no material conflict between the laws.

First, under California law, Plaintiff fails to sufficiently allege that an equitable accounting is required. She pleads no facts that an "ordinary legal action" is impracticable or that accounts are so complicated as to require an accounting. Plaintiff only states that an accounting is required because "Defendants are in the best position

21

to know the true and correct amount of revenues generated from the *Terrifier* motion pictures and merchandise to which Corcoran is entitled to a percentage." FAC ¶ 71. However, merely because Defendants are in the "best position" to know relevant information does not mean Plaintiff is entitled to an accounting. She concludes, with no other factual assertions, that "the balance [due to her under the contract] can only be ascertained through an accounting." Opp'n at 29.

Courts have dismissed similar claims for accountings where a plaintiff seeks a "sum that could be deduced from Defendants' records, which could be produced in discovery if Plaintiff sufficiently states claims for relief and would not require an equitable action for an accounting." *Hueso*, 527 F. Supp. 3d at 1235. Similarly, the records Plaintiff claims she needs are in the hands of Defendants, making it information that could be produced in discovery. There is no pleading or allegation that an equitable remedy, such as accounting, is required. Thus, Plaintiff fails to state a claim under California law.

Plaintiff's claim also fails under New York law as she has failed to allege any fiduciary or confidential relationship between the Parties. Nowhere does Plaintiff assert or argue that such a relationship exists between the Parties and, thus, fails to plead this element.

Accordingly, the Court **GRANTS** Defendants' Motion with respect to Claim Seven.

## I.  Claim Eight – Common Law Invasion of Privacy

Plaintiff's eighth cause of action alleges that Defendants "publicly disclosed private facts concerning Corcoran by intentionally distributing, republishing, and monetizing nude images and footage depicting Corcoran's intimate body parts without her informed consent." FAC ¶ 75. In order to plead a claim of public disclosure of private facts, Plaintiff must allege "(1) public disclosure (2) of a private fact (3) which would be offensive and objectionable to the reasonable person and (4) which is not of legitimate public concern." *Brown v. Metro by T-Mobile*, 768 F. Supp. 3d 1068, 1083

22

(C.D. Cal. 2024).

First, for the same reasons as those articulated in Section III.B, Plaintiff's allegations surrounding Defendants' alleged disclosure of still images taken of her nude body fails to state a claim for invasion of privacy. She provides only conclusory allegations that such images were shared "upon information and belief" and, as discussed above, such pleading will not support an allegation that images were shared.

Next, the Court reviews her claim that distribution of *Terrifier*, with her nude scene, constitutes a violation of privacy. Such an argument fails because the offending material cannot be considered "private facts." "In assessing whether disclosed visual content amounts to a "private fact," courts consider whether the content was captured in public rather than in private, whether the subject of the content was voluntarily captured and the degree to which the content reveals intimate details otherwise unknown to the wider public." *Brown*, 768 F. Supp. 3d at 1084 (C.D. Cal. 2024). Moreover, there "can be no privacy with respect to a matter that is already public or which has previously become part of the public domain." *Sipple v. Chronicle Publ'g Co.*, 154 Cal. App. 3d 1040, 1045 (1984).

In this case, Plaintiff voluntarily appeared on a public film set where Plaintiff understood that the material would be used in a public film. Plaintiff's attempt to claim a lack of "informed consent" is belied by her own factual allegations, where she admits she understood the she would be filmed nude in the scene and that she willingly filmed the scene over the course of ten hours.

Plaintiff's attempt to rely on *Michaels v. Internet Entertainment Group Inc.*, 5 F.Supp.2d 823, 840 (C.D. Cal. 1998), is also not persuasive. In *Michaels*, the district court reviewed a motion for a preliminary injunction and found a likelihood of success on the merits of plaintiff's claim for public disclosure of private facts where a private tape depicting plaintiff engaged in sexual relations was made public on the Internet. *Id.* Notably, the offending material in *Michaels* was never intended for public view nor was it captured for the purpose of public consumption. *Id.* That is not the case here. The

film, in which Plaintiff appeared on a film set with the express purpose of creating a public film, contains matters that "[P]laintiff [left] open to the public eye." *Sipple*, 154 Cal. App. 3d at 1047.

Accordingly, the Court finds that Plaintiff has not alleged a claim for public disclosure of private facts and **GRANTS** Defendants' Motion with respect to Claim Eight.

### J.  Leave to Amend

"Courts are free to grant a party leave to amend whenever 'justice so requires,'" and requests for leave should be granted with 'extreme liberality.'" *Moss v. U.S. Secret Service*, 572 F.3d 962, 972 (9th Cir. 2009) (citations omitted). The Court considers five factors in assessing a motion for leave to amend: "bad faith, undue delay, prejudice o the opposing party, and whether plaintiff has previously amended the complaint." *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004).

Given that the Court has yet to set trial and pretrial dates and that the case is in its early stages, there would be no undue delay in granting leave to amend. Defendants have also asserted no prejudice should Plaintiff be granted leave to amend nor is there any allegation of bad faith. The fact Plaintiff has already amended once, after conferring with Defendants, weighs against granting leave to amend, but not strongly. *See Johnson v. Maraj*, 2024 WL 1829615, at * 2 (C.D. Cal. Feb. 23, 2024). Additionally, the Court finds that leave to amend should be granted because it cannot be determined that "the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) *overruled, in part on other grounds by, Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014).

Consistent with the liberal policy for amendment, the Court **GRANTS** Plaintiff leave to amend.

### IV.   CONCLUSION

Defendants' Motion is **GRANTED IN PART AND DENIED IN PART** with leave to amend. Any amended complaint must be filed within thirty (30) days of the

date of this Order.

The parties are **<u>ORDERED</u>** to meet and confer and to file within 30 days of this Order an Amended Rule 26(f) Joint Report, including a new Schedule Worksheet with appropriate dates.

**IT IS SO ORDERED.**

Dated: July 2, 2026

_____

HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE

25